**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHANGYOU.COM LIMITED SECURITIES LITIGATION | Case No. 1:21-cv-07858-GHW<br><br>CLASS ACTION |

**DECLARATION OF JAKE BISSELL-LINSK IN FURTHER SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF
<u>PROPOSED CLASS ACTION SETTLEMENT</u>**

I, Jake Bissell-Linsk, declare and state as follows, pursuant to 28 U.S.C. § 1746:

1.      I am Of Counsel at the law firm of Labaton Sucharow LLP, Court-appointed Lead Counsel in this proposed class action and am admitted practicing before this Court.  I respectfully submit this declaration to provide additional information about the proposed Settlement, in response to questions raised by the Court during the May 2, 2021, conference.[1]  ECF No. 53.

2.      A revised proposed Preliminary Approval Order and exhibits, with the changes requested by the Court, as well as the Declaration of Paul Mulholland Concerning Proposed Notice Program, are attached hereto.

3.      This remainder of declaration addresses two topics: (1) an approximation of class-wide damages in this Action and (2) an explanation of the proposed Plan of Allocation submitted in connection with this Settlement.

**Approximation of Damages in Connection with Settlement**

4.      The crux of the damages theory in this case was that Defendants' allegedly false denial of the existence of appraisal rights caused class members to not obtain fair value for their shares when selling or tendering in the Merger.  However, proving to a trier of fact that the value of Changyou ADS was in truth higher than the prices class members received when they sold the ADS, or that class members held ADS to their detriment, would have been very costly, difficult, and complex, and would have been hotly contested by the Parties' respective experts.  Ultimately, the fair value of the ADS would have been the subject of a complex "battle of the experts" and up to a jury to decide — with no certainty that Lead Plaintiff's experts would be credited over

---

[1] All capitalized terms used in this declaration that are not defined have the same meanings as in the Stipulation and Agreement of Settlement, dated as of March 28, 2022 (the "Stipulation"), previously filed with the Court. ECF No. 49-1.

Defendants' experts.  Given the posture of the case, the Parties had not begun fact or expert discovery.  The discussion below is intended to provide the Court with a sense of the magnitude of potential class-wide damages in the Action only for purposes of evaluating the proposed Settlement.

5.    To approximate class-wide damages, it is **first** necessary to estimate the number of allegedly damaged shares.  For purposes of the following simple approximation of damages, the total outstanding ADS held by non-insiders can be added to the number of ADS sold during the Class Period, as follows:[2]

(a)    Changyou's Schedule 13E-3 filed with the Securities and Exchange Commission on February 19, 2020 (the "13E-3") states that there were 19,113,056 Changyou ADS outstanding at that time.

(b)    The 13E-3 further states that directors and executive officers of Changyou held 1,177,632 of Changyou's outstanding ADS.

(c)    According to data from Bloomberg, the total volume of ADS traded during the Class Period was approximately 7,938,066 shares.[3]  Consistent with standard practice by experts in such matters, a 50% reduction to volume is often applied to account for market makers

---

[2] A more precise estimate would take into account ADS that were converted to common stock for purposes of seeking appraisal.  An appraisal action was filed in the Cayman Islands, *In re Changyou.com Limited*, Cause No. FSD 120 of 2020, by eight investors (the "Appraisal Parties").  One of those parties was Athos Asia Event Driven Master Fund, and Bloomberg Data reports that Athos Capital Ltd. ("Athos") held 4,017,970 ADS as of February 25, 2020.  A more precise estimate may try to account for these shares by assuming that these entities are related and that Athos converted the ADS it held into common stock for purposes of seeking appraisal.  Similarly, a judicial opinion in the appraisal action also stated that other Appraisal Parties (besides Athos) sought appraisal of 2,323,164 shares, but that opinion does not list the total number of shares upon which all Appraisal Parties sought appraisal.  The damages estimations in this declaration  have not made adjustments to account for these shares.

[3] The last trading day for which Bloomberg has data is April 17, 2020.  Consequently, this volume figure does not include the sales that occurred through to the close of the Merger.

on the NASDAQ, where Changyou was listed during the Class Period using the ticker CYOU, which would result in total counted sales (prior to the close of the Merger) of 3,969,033.

6.      Adding the outstanding ADS held by non-insiders (¶4(a)-(b)) to the sales counted from trading volume (¶4(c)) results in 21,904,457 total counted sales ("Allegedly Damaged ADS Sold").

7.      The **second** step of approximating the class-wide damages for purposes of this analysis, is to estimate the fair value of the ADS.  This number can then be used to estimate the alleged losses suffered upon each sale.  Below are three potential values for the estimated fair value of the ADS:[4]

(a)      The proposed Plan of Allocation uses a nominal fair value of $38.26 per ADS at or around the time of the Merger, *see* paragraph 99 of the Second Amended Complaint (ECF No. 38), which is based upon adjustments to the peer set used in Changyou's publicly filed documents regarding the Company's supposed valuation in the Merger.  The adjustments were made to reflect an allegedly more accurate set of Changyou's peers.  The nominal fair value figure is based on the mean of the peers' adjusted Enterprise Value to EBITDA ratios, a standard approach used in performing valuation.

(b)      Paragraph 99 of the Second Amended Complaint (ECF No. 38) also alleged a valuation based on the same analysis described in the prior subparagraph ¶6(a) but used the median of the revised peer-firms' Enterprise Value to EBITDA ratios (rather than the mean), which produced a potential fair value of $25.24 per ADS.

---

[4] The valuation allegations in the Second Amended Complaint discussed in ¶6(a)-(b) of this declaration (and ¶¶99 of the Second Amended Complaint, ECF No. 38) were prepared in consultation with an expert on valuation.  However, these estimates are not meant to serve as a final assessment of fair value, and are not meant to represent the arguments Lead Plaintiff would advance if this case proceeded through trial after the completion of discovery.

(c)       Paragraph 98 of the Second Amended Complaint (ECF No. 38) describes an adjustment to Changyou's valuation based on its real property holdings, and, as alleged, this adjustment would have increased Changyou's ADS value by $1.28 per ADS.  If the fair value of the ADS were calculated as the $10.80 price paid in the Merger (the "Deal Price") plus this $1.28 per ADS increase, then the fair value of the ADS would be $12.08.

8.        While each of the above fair value estimates could be used to estimate aggregate damages, for purposes of this declaration, the mean of the three potential fair value figures stated above is useful for illustration purposes, and it calculates to $25.19 per ADS (the "Illustrative Fair Value").  For the avoidance of doubt, this is not an assessment of Changyou's true fair value.  It is merely a potential fair value given the allegations in the Second Amended Complaint.

9.        The **third** step of approximating class-wide damages is to estimate the per-ADS damages, as follows:

(a)       If Lead Plaintiff were successful at trial, class members who sold or tendered would not have simply received the fair value of the ADS as damages.  Instead, after a contested damages and claims process, class members would likely be entitled to receive the difference between the fair value for the ADS and the value the class members received when they sold or tendered.

(b)       Therefore, in a successful case, class members who tendered shares in the Merger would likely receive the difference between the fair value of the shares and the $10.80 Deal Price that they received upon selling.  However, class members who sold shares during the Class Period prior to the close of the Merger, sold at a variety of prices.  For purposes of estimating class-wide damages for this analysis, the volume weighted average closing price of Changyou ADS during the Class Period can be used to estimate the average price class members sold at prior

to the close of the Merger. That volume weighted average price was $10.67 per share. Because the volume weighted average is relatively close to the $10.80 deal price, for simplicity, the mean of the Deal Price and the volume weighted average price can be used to estimate the average sale price, which results in $10.74 per share.

(c)      To estimate alleged damages per ADS, the Illustrative Fair Value of $25.19 can be subtracted from the average sale price ($10.74), which results in per ADS estimated damages of $14.46 (the "Estimated Damages Per ADS").

10.      The **final** step of approximating the class-wide damages is to multiply the number of Allegedly Damaged ADS Sold (21,904,457) by the Estimated Damages Per ADS ($14.46). This results in total estimated damages in the range of approximately $317 million.

11.      However, another way of looking at the potential size of a recovery in this case were Lead Plaintiff to be successful at trial, would be to look at typical recoveries in appraisal litigation. Academic research indicates that in recent years (2015-2019), average return to investors through appraisal litigation has been approximately 13.2%.[5] Here, treating a 13.2% increase to the $10.80 Deal Price as the estimated fair value (*i.e.*, $12.23), and using the same methodology as above, would imply class-wide damages of approximately $32.6 million (*i.e.,* taking the $12.23 fair value per ADS, subtracting the $10.74 average sale price to determine an estimated damage per ADS and then multiplying the result by the 21,904,457 Allegedly Damaged ADS Sold).

---

[5] Jiang, Wei and Li, Tao and Thomas, Randall S. and Thomas, Randall S., *The Long Rise and Quick Fall of Appraisal Arbitrage* (February 28, 2020), Vanderbilt Law Research Paper No. 20-16. As the article states, a substantial portion of this overall recovery in appraisal cases is the result of pre-judgment interest, meaning that this estimate would tend to *overstate* damages attributable exclusively to determinations of fair value.

**Explanation of Proposed Plan of Allocation**

12.     With the assistance of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including securities litigation, Lead Counsel prepared the proposed Plan of Allocation.  The following is an explanation of the reasoning behind the Plan of Allocation and its methodology for calculating losses for purposes of a *pro rata* distribution of the Net Settlement Fund among eligible claimants.

13.     The proposed Plan of Allocation attributes losses based on three categories of transactions.  Category A recognizes losses based on ADS that were sold or tendered on April 23, 2020.  Category B recognizes losses based on ADS that were held at the start of the Class Period and sold during the Class Period.  Category C recognizes losses for all other ADS that were sold during the Class Period.

14.     Losses for each category are based on the difference between the estimated nominal fair value of the ADS and the price the ADS was sold at.  The nominal fair value in the Plan of Allocation ($38.26) is a value assigned for purposes of deriving the per share loss.  It is intended to be reasonable in light of the allegations in the Action, *see* discussion above, but is not intended to be a factual estimate of fair value.

15.     The *pro rata* recovery any given claimant will receive will be determined based on that claimant's recognized loss amount as a portion of the total estimated loss amount of all claimants.  Because the same nominal fair value is used in each loss category, and the settlement is divided *pro rata* (with the exception of the cap applied to Category C), increasing or decreasing the nominal fair value within a reasonable range, would not result in materially greater or smaller

recovery amounts for each claimant.[6]  In other words, increasing the nominal fair value increases each claimants' recognized loss, but also increases the total recognized losses.  The claimant-specific numerator and class-wide denominator move in the same direction, leaving the *pro rata* recovery calculation relatively unchanged.

16.    The Plan of Allocation calculates recognized losses in Category A (losses from ADS that were tendered or sold on April 23, 2020) and Category B (losses from ADS that were held before the Class Period and sold during the Class Period) similarly.  Each is assigned a recognized loss of the estimated nominal fair value per ADS of $38.26 minus the ADS sale price. In the case of Category A, the sale price is the $10.80 deal price.  In the case of Category B, the sale price is the actual sale price.  This treatment has been proposed because of the assessment that these two types of transactions faced risks that were similar in significance.

17.    With respect to Category C (*i.e.*, ADS purchased during the Class Period and sold during the Class Period), although the loss calculation is similar to that of Category B, the Plan of Allocation puts a cap on the total allocation available to this third category of recognized losses of no more than 5% of the Net Settlement Fund.  This treatment has been proposed because of the assessment that this category of ADS faced the greatest risks to succeeding through litigation.

---

[6] If all class members sold at identical prices, the (lower than the nominal fair value), then changing the nominal fair value would not affect recovery at all.  However, because class members sold at different prices, changes to the nominal fair value could have an effect on their recovery, though the effect will be minimal, as Changyou prices were relatively flat over the Class Period.

To use a simplistic example, if: (a) the nominal fair value were set at $38.26, (b) the average sale price throughout was $10.67, (c) class members sought recovery based on 15 million damages shares, and (d) the total money to be distributed to class members through the settlement was $1 million, **then** a shareholder who had recognized losses from 500,000 shares tendered at the $10.80 deal price would recover $33,176.  If the nominal fair value was increased to $50 or decreased to $25, holding all other assumptions constant, that same shareholder would recover $33,223 or $33,031 respectively.  These amounts differ by well under 1%, showing that the precise fair value applied in the proposed Plan of Allocation is not a critical input to any claimant's recovery.

**Additional Submissions Requested by the Court**

18.    Annexed hereto as Exhibit 1 is the Declaration of Paul Mulholland Concerning Proposed Notice Program, dated May 16, 2022.

19.    Annexed hereto as Exhibit 2 are redlines showing revisions made, at the request of the Court, to the following documents: the proposed Preliminary Approval Order, the long-form Notice, the Summary Notice, and the Postcard Notice.  No changes were made to the proposed Claim Form.

20.    Annexed hereto as Exhibit 3 are clean versions of the revised proposed Preliminary Approval Order, long-form Notice, Summary Notice, and Postcard Notice.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 18, 2022.

/s/ *Jake Bissell-Linsk*
JAKE BISSELL-LINSK