**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHANGYOU.COM LIMITED SECURITIES LITIGATION | Case No. 1:21-cv-07858-GHW<br><br>CLASS ACTION |

**DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

I, CAROL C. VILLEGAS, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), which serves as court-appointed Lead Counsel for Lead Plaintiff ODS Capital LLC ("Lead Plaintiff").[1]  I have been actively involved throughout the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth below based upon my close supervision of the material aspects of the Action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, as well as Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses.  Both motions have the full support of Lead Plaintiff.  *See* Declaration of Hilary Shane on behalf of Lead Plaintiff (the "Shane Decl."), dated December 21, 2022, attached as Exhibit 1.[2]  To date, there have been no objections to any aspect of the Settlement or the Fee and Expense Application.

## I.      PRELIMINARY STATEMENT

3.      It is respectfully submitted that the Settlement provides a favorable certain recovery for the Settlement Class in the amount of $1,075,000 in cash.  As set forth in the Stipulation, in exchange for this payment, the proposed Settlement resolves all claims asserted, or that could have

---

[1] All capitalized terms not otherwise defined below have the same meaning as in the Stipulation and Agreement of Settlement, dated as of March 28, 2022 (the "Stipulation", ECF No. 49-1).

[2] Citations to "Exhibit" or "Ex.___" refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit and the second alphabetical reference is to the exhibit designation within the exhibit itself.

been asserted, in the Action by Lead Plaintiff and the Settlement Class and related claims against the Released Defendant Parties. ECF No. 49-1.

4. The claims in the Action, which are relatively unique within the sphere of securities class actions, arise from alleged misrepresentations regarding the availability of appraisal rights in connection with Changyou's "going-private" transaction (the "Merger"). Prior to filing the complaints in the Action, Lead Counsel engaged in a robust review of Changyou's Merger, the availability of causes of action under the Securities Exchange Act of 1934 ("Exchange Act") to remedy injuries to allegedly defrauded securities sellers, appraisal rights, and Cayman Island law. This process included, among other things, analyzing: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; and (v) the applicable law governing the claims and potential defenses. In addition, Lead Counsel worked with an expert on valuation issues to assess whether Changyou's fair value exceeded the price paid in the Merger, which required detailed analysis of Changyou's business based on publicly available documents and complex valuation work.

5. As discussed in detail below, and in the previously submitted Declaration of Jake Bissell-Linsk in Further Support of Lead Plaintiff's Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 56), maximum aggregate damages in the Action would depend upon a factual determination of the value of the Changyou shares sold by class members. Estimated damages ranged from approximately $32.6 million to $317 million. *See* Bissell-Linsk Decl., ECF No. 56 at 6. However, loss causation and damages were expected to be especially

contested issues in this case, and there was a substantial risk that Lead Plaintiff would not have succeeded at establishing even the low end of this damages estimate ($32.6 million), even if Lead Plaintiff did succeed in proving that Defendants made materially false statements or omissions with the requisite mental state.

6.      Notably, with respect to Lead Plaintiff's ability to prove the other elements of the claims, and as explained below, following the filing of the Action, a decision was reached in the lawsuit *Haideri v. Jumei Int'l Holding Ltd., et al.*, 20-cv-02751-EMC, (N.D. Cal. Sept. 14, 2021) ("*Jumei*"), which addressed allegations very similar to those here, namely that a Chinese-based Cayman incorporated company allegedly falsely stated, among other things, that minority shareholders did not have appraisal rights in a short-form merger under Cayman law.  In response to defendants' motion to dismiss, the Northern District of California dismissed the claims for failure to adequately plead scienter and loss causation.

7.      In light of the risks of dismissal and many challenges to proving the claims, especially to proving loss causation and damages, Lead Counsel believes the Settlement is a favorable result for the Settlement Class.[3]  In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the challenges associated with advancing the claims alleged in the operative Complaint, the risks of certifying a class for the full Class Period, the risks to prevailing at summary judgment and trial, and in any subsequent appeals.  The Settlement was achieved in the face of staunch opposition by Defendants who would have, had the Settlement not been reached, continued to raise serious challenges to each of the elements of Lead Plaintiff's claims.

---

[3] *See* Section V., below, and the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Brief").

The Settlement eliminates these risks while providing a guaranteed recovery to the Settlement Class in a timely manner.

8.     In addition to seeking approval of the Settlement, Lead Plaintiff also seeks approval of the proposed Plan of Allocation for distributing the proceeds of the Settlement.  As discussed in further detail below and in the Settlement Brief, the proposed Plan of Allocation was developed by Lead Counsel with the assistance of Lead Plaintiff's damages expert, reflects the theory of the case, and will provide for the fair and equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment.

9.     With respect to the Fee and Expense Application, as discussed in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Brief"), the requested fee of 30% of the Settlement Fund would be fair to the Settlement Class, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action and would provide no multiplier on Lead Counsel's lodestar to date.  Lead Counsel also seeks Litigation Expenses totaling $41,785.97 and an award to Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(4), in the amount of $15,000 — which, when combined, are less than the cap on expenses of $60,000 provided for in the Notice.

## II.    SUMMARY OF LEAD PLAINTIFF'S CLAIMS

10.     Changyou is an online game company primarily operating in China. *See* Compl., ¶25, ECF No. 38. In 2009, Changyou conducted an initial public offering of ADSs in the United States. *Id.* ¶35. Sohu was Changyou's controlling shareholder throughout the Class Period. *Id*. ¶27. In January 2020, Changyou, Sohu Game (a subsidiary of Sohu), and Changyou Merger Co. Limited, agreed to execute a going private transaction (the Merger). *Id.* at ¶¶42-50. The transaction was structured as a "short form" merger, meaning that it did not require a vote of public

4

shareholders. *Id.* at ¶43. Through the transaction, Sohu would essentially buy each outstanding ADS for $10.80, resulting in Sohu owning the Company. *Id.* at ¶¶42-45.

11.    Lead Plaintiff alleges, among other things, that the Rule 13e-3 Transaction Statement filed with the SEC and sent to ADS holders in connection with the transaction contained allegedly false and misleading statements regarding the unavailability of "dissenters'" or "appraisal" rights, and other potential rights, for dissenting shareholders in short-form mergers under the Cayman Islands Company Law and/or omitted material information rendering Defendants' statements false and misleading. *See generally*, *id.* ¶¶68-86. Lead Plaintiff alleges that during the Class Period, Defendants' alleged wrongdoing artificially deflated the prices of Changyou ADSs, allegedly misled sellers of Changyou ADSs concerning their rights and, as a result of their sales (including tendering) of Changyou ADSs, members of the class allegedly suffered damages under the federal securities laws. *Id.* at ¶¶94-109.

## III.    RELEVANT PROCEDURAL HISTORY

### A.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

12.    On December 8, 2020, ODS Capital filed its initial securities class action complaint in the U.S. District Court, Eastern District of New York, styled *ODS Capital LLC v. Changyou.com Limited, et al.*, No. 1:20-cv-05973 (the "*E.D.N.Y. Action*"). The case was assigned to the Honorable Kiyo A. Matsumoto. By Order dated April 14, 2021 (ECF No. 9), the Court appointed ODS Capital LLC as Lead Plaintiff and approved Labaton Sucharow LLP as Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

### B.    The First Amended Complaint

13.    On July 2, 2021, Lead Plaintiff filed its Amended Complaint for Violations of the Federal Securities Laws (ECF No. 18) (the "Amended Complaint"), which dropped Changyou

Merger Co. as a named defendant and asserted claims (i) against all Defendants, except Defendant Chen, under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (ii) against all Defendants under Section 13(e) of the Exchange Act and Rule 13e-3 promulgated thereunder; and (iii) against Defendants Chen, Zhang, and Lv under Section 20(a) of the Exchange Act. Lead Plaintiff asserted such claims on behalf of a class of (a) all holders of Changyou ADSs on April 23, 2020, and (b) all sellers of Changyou ADS during the Class Period.

14. Prior to filing the Amended Complaint, Lead Plaintiff, through Lead Counsel, conducted a thorough investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included, among other things, analyzing: (i) documents filed publicly by the Company with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; and (v) the applicable law governing the claims and potential defenses. Lead Counsel also worked with an international investigator in China and consulted with experts with respect to damages and loss causation issues, and dissenter shareholder rights under Cayman law.

C. **Motion to Dismiss the Amended Complaint, and Transfer from E.D.N.Y. to S.D.N.Y., and the Filing of the Second Amended Complaint**

15. On August 9, 2021, Settling Defendants[4] filed a pre-motion letter seeking to file a motion to dismiss (ECF No. 29), which Lead Plaintiff replied to (ECF No. 30). Judge Matsumoto held a pre-motion conference on September 2, 2021. During the conference, Judge Matsumoto raised concerns regarding the appropriateness of venue in the Eastern District of New York. On

---

[4] Defendant Charles Zhang has not appeared in the Action and is not a party to the Settlement, but he is one of the Released Defendant Parties.

September 17, 2021, the parties filed a stipulation agreeing to transfer the *E.D.N.Y. Action* to the Southern District of New York (ECF No. 32), a venue that was consented to in the public agreements relating to the ADSs. Judge Matsumoto so ordered the stipulation and transferred the case on September 18, 2021 (ECF No. 33).

16.    On September 21, 2021, the Southern District of New York docketed the transferred case as *In re Changyou.com Limited Securities Litigation*, No. 1:21-cv-07858 (ECF No. 34) (the "*S.D.N.Y. Action*" and, together with the E.D.N.Y. Action, the "Action"), and the Honorable Gregory H. Woods was assigned to the case.

17.    On October 8, 2021, Lead Plaintiff filed a Second Amended Complaint for Violations of the Federal Securities Laws (ECF No. 38) (the "Complaint"), which was substantially the same as the Amended Complaint, with minor changes to reflect the change in venue from the Eastern District of New York to the Southern District of New York. On October 29, 2021, Settling Defendants served a motion to dismiss the Complaint, which, pursuant to the Court's September 2, 2021 Minute Entry, was not filed on the docket.  The Settlement was reached before Lead Plaintiff served its opposition.

**D.    Negotiation of the Settlement and the Terms of the Proposed Settlement**

18.    In October 2021, the Parties began discussing the possibility of reaching a negotiated settlement of the claims. After extended arm's-length discussions, the Parties reached an agreement in principle to settle the Action on November 24, 2021, subject to the execution of a "customary long form" stipulation and agreement of settlement and related papers.

19.    The Parties subsequently entered into the Stipulation, which sets forth the final terms and conditions of the Settlement, including, among other things, a release of all claims asserted against Defendants in the Action and related claims, "Released Claims," against all "Released Defendant Parties." Stipulation at ¶¶1(z) – (aa).  Once the Settlement reaches its

7

Effective Date, the Released Claims will be forever dismissed with prejudice. *Id.* ¶4. Upon the Effective Date of the Settlement, the Settling Defendants will also release any Released Defendants' Claims concerning the litigation and settlement of the Action against the Released Plaintiff Parties. *Id.* ¶5.

20. The Parties also entered into a confidential Supplemental Agreement Regarding Requests for Exclusion, dated March 28, 2022, ("Supplemental Agreement") concerning the Settling Defendants' right to withdraw from the Settlement if a certain threshold of requests for exclusion is received. *Id.* ¶39. It is typical to keep such agreements confidential so that potential opt outs do not use them to leverage additional recoveries for themselves, at the expense of the class. If the termination threshold is ultimately reached, notice will be filed with the Court before the Settlement Hearing. The Stipulation and Supplemental Agreement are the only agreements between the Parties in connection with the Settlement.

21. In exchange for the releases, Changyou caused the payment of $1,075,000 for the benefit of the Settlement Class. *Id.* ¶6.

## IV.    APPROXIMATION OF DAMAGES IN CONNECTION WITH SETTLEMENT

22. The crux of the damages theory in this case was that Defendants' allegedly false denial of the existence of appraisal rights caused class members to not obtain fair value for their shares when selling or tendering in the Merger. However, proving to a trier of fact that the value of Changyou ADS was in truth higher than the prices class members received when they sold the ADS, or that class members held ADS to their detriment, would have been very costly, difficult, and complex, and would have been hotly contested by the Parties' respective experts. Ultimately, the fair value of the ADS would have been up to a jury to decide — with no certainty that Lead Plaintiff's experts would be credited over Defendants' experts. Given the posture of the case, the Parties had not begun fact or expert discovery. The discussion below is intended to provide the

Court with a sense of the magnitude of potential class-wide damages in the Action only for purposes of evaluating the proposed Settlement.

23.     To approximate class-wide damages, it is first necessary to estimate the number of allegedly damaged shares.  For purposes of the following simple approximation of damages, the total outstanding ADS held by non-insiders can be added to the number of ADS sold during the Class Period, as follows:

(a)     Changyou's Schedule 13E-3 filed with the SEC on February 19, 2020 (the "13E-3") states that there were 19,113,056 Changyou ADS outstanding at that time.

(b)     The 13E-3 further states that directors and executive officers of Changyou held 1,177,632 of Changyou's outstanding ADS.

(c)     According to data from Bloomberg, the total volume of ADS traded during the Class Period was approximately 7,938,066 shares.  Consistent with standard practice by experts in such matters, a 50% reduction to volume is often applied to account for market makers on the NASDAQ, where Changyou was listed during the Class Period using the ticker CYOU, which would result in total counted sales (prior to the close of the Merger) of 3,969,033.

(d)     Adding the outstanding ADS held by non-insiders (¶23(a)-(b)) to the sales counted from trading volume (¶23(c)) results in 21,904,457 total counted sales ("Allegedly Damaged ADS Sold").

24.     The second step of approximating the class-wide damages for purposes of this analysis, is to estimate the fair value of the ADS.  This number can then be used to estimate the alleged losses suffered upon each sale.  Below are three potential values for the estimated fair value of the ADS, which would need to be proven at trial were the case to continue:

9

(a)    The proposed Plan of Allocation uses a nominal fair value of $38.26 per ADS at or around the time of the Merger, *see* paragraph 99 of the Complaint (ECF No. 38), which is based upon adjustments to the peer set used in Changyou's publicly filed documents regarding the Company's supposed valuation in the Merger. The adjustments were made to reflect an allegedly more accurate set of Changyou's peers. The nominal fair value figure is based on the mean of the peers' adjusted Enterprise Value to EBITDA ratios, a standard approach used in performing valuation.

(b)    Paragraph 99 of the Complaint (ECF No. 38) also alleged a valuation based on the same analysis described in the prior subparagraph ¶24(a) but used the median of the revised peer-firms' Enterprise Value to EBITDA ratios (rather than the mean), which produced a potential fair value of $25.24 per ADS.

(c)    Paragraph 98 of the Complaint (ECF No. 38) describes an adjustment to Changyou's valuation based on its real property holdings, and, as alleged, this adjustment would have increased Changyou's ADS value by $1.28 per ADS. If the fair value of the ADS were calculated as the $10.80 price paid in the Merger (the "Deal Price") plus this $1.28 per ADS increase, then the fair value of the ADS would be $12.08.

25.    While each of the above fair value estimates could be used to estimate aggregate damages, for purposes of this declaration the mean of the three potential fair value figures stated above is useful for illustration purposes, and it calculates to $25.19 per ADS (the "Illustrative Fair Value"). For the avoidance of doubt, this is not an assessment of Changyou's true fair value. It is merely a potential fair value given the allegations in the Complaint.

26.    The third step of approximating class-wide damages is to estimate the per-ADS damages, as follows:

(a)    If Lead Plaintiff were successful at trial, class members who sold or tendered would not have simply received the fair value of the ADS as damages. Instead, after a contested damages and claims process, class members would likely be entitled to receive the difference between the fair value for the ADS and the value the class members received when they sold or tendered.

(b)    Therefore, in a successful case, class members who tendered shares in the Merger would likely receive the difference between the fair value of the shares and the $10.80 Deal Price that they received upon selling. However, class members who sold shares during the Class Period prior to the close of the Merger, sold at a variety of prices. For purposes of estimating class-wide damages for this analysis, the volume weighted average closing price of Changyou ADS during the Class Period can be used to estimate the average price class members sold at prior to the close of the Merger. That volume weighted average price was $10.67 per share. Because the volume weighted average is relatively close to the $10.80 deal price, for simplicity, the mean of the Deal Price and the volume weighted average price can be used to estimate the average sale price, which results in $10.74 per share.

(c)    To estimate alleged damages per ADS, the Illustrative Fair Value of $25.19 can be subtracted from the average sale price ($10.74), which results in per ADS estimated damages of $14.45 (the "Estimated Damages Per ADS").

27.    The final step of approximating the class-wide damages is to multiply the number of Allegedly Damaged ADS Sold (21,904,457) by the Estimated Damages Per ADS ($14.45). This results in total estimated damages in the range of approximately $317 million.

28.    However, another way of looking at the potential size of a recovery in this case were Lead Plaintiff to be successful at trial, would be to look at typical recoveries in appraisal

11

litigation.  Academic research indicates that in recent years (2015-2019), average return to investors through appraisal litigation has been approximately 13.2%. Here, treating a 13.2% increase to the $10.80 Deal Price as the estimated fair value (i.e., $12.23), and using the same methodology as above, would imply class-wide damages of approximately $32.6 million (i.e., taking the $12.23 fair value per ADS, subtracting the $10.74 average sale price to determine an estimated damage per ADS and then multiplying the result by the 21,904,457 Allegedly Damaged ADS Sold).

## V.   RISKS FACED BY LEAD PLAINTIFF IN THE ACTION

29.   Based on publicly available information and documents obtained through counsel's investigation, Lead Counsel believes that it would be able to adduce substantial evidence to support Lead Plaintiff's and the Settlement Class's claims.  However, Lead Counsel also recognizes that Lead Plaintiff and the Settlement Class faced significant risks and defenses in continuing to litigate. If any of the risks materialized, Lead Plaintiff's and the Settlement Class's potential recovery could be seriously jeopardized.  Lead Plaintiff and Lead Counsel carefully considered these risks in reaching the Settlement.  Several challenges permeated Lead Plaintiff's claims, which would have surfaced on Defendants' motion to dismiss and at class certification, summary judgment and trial.

30.   The seriousness of these risks was amplified by the *Jumei* decision, where the District Court rejected claims at the pleading stage based on highly similar facts.  Specifically, *Jumei* addressed allegations very similar to those here, namely that a Chinese-based Cayman incorporated company allegedly falsely stated, among other things, that minority shareholders did not have appraisal rights.  In response to defendants' motion to dismiss, the Northern District of California dismissed the claims for failure to adequately plead scienter and loss causation.

31.     Leaving aside *Jumei*, Lead Plaintiff faced a very real risk of not surviving the pending motion to dismiss.  Defendants strenuously argued that the alleged misstatements are inactionable as a matter of law, and that Lead Plaintiff has not pled sufficient facts to demonstrate that any alleged misstatement was false when made.  Defendants also argued that Lead Plaintiff did not plead a strong inference of scienter with respect to each Defendant.  According to analyses of federal securities class actions conducted by NERA Consulting, in 2020, 77% of filed securities class actions were dismissed, and in 2021, 64% were dismissed.  *See* Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA 2022), Ex. 2 at 11.  Moreover, motions to dismiss securities class actions from 2012 to 2021 were denied in full only 19% of the time.  *Id*. at 14.

32.     There were material risks to Lead Plaintiff's ability to prove its allegations of **falsity**.  Defendants would have argued throughout ongoing litigation that the relevant statements – concerning the exercise of appraisal rights – were inactionable legal opinions and immaterial as a matter of law.  While Lead Plaintiff had responses to this argument, it would have been a hotly contested dispute through the motion to dismiss, summary judgment, trial, and likely appeals.  Had Lead Plaintiff prevailed in establishing that the statements were not *per se* inactionable, Defendants would also argue that the "opinions" offered were inactionable because they were honestly held.  Here, Lead Plaintiff had arguments in response, but the underlying legal issue – the right to appraisal in short form mergers under Cayman law – was not firmly decided under Cayman law at the time of Defendants' statements, and so it would be challenging to show they did not or could not have held the stated belief.  Indeed, the issue is still unsettled as Changyou has continued to pursue appeals from the initial Cayman opinion finding the existence of such appraisal rights, creating a further risk that both (a) Lead Plaintiff could fail to demonstrate Defendants did not

13

believe the statements and (b) that an adverse ruling on appeal could actually find the rights were as Defendants claimed in the Merger documents.[5]

33.    Proving **scienter** was also a significant challenge to Lead Plaintiff.  Lead Plaintiff had several pieces of circumstantial evidence that supported a strong inference that Defendants understood their public statements were false or at least incomplete.  However, Defendants would have argued that such evidence was insufficient to establish that the inference of fraudulent intent was more compelling than the alternative, or to prove that they acted with scienter at trial.  Lead Plaintiff would also argue that Defendants had a motive and opportunity to defraud based on their ability to profit through the Merger, but Defendants would have arguments that this allegation was too generalized to meet Lead Plaintiff's burden to establish scienter.

34.    Proving **reliance or transaction causation** was also a significant risk to Lead Plaintiff.  Defendants would have argued that the alleged misstatements did not affect the market price of Changyou securities and that, therefore, Lead Plaintiff and class members could not rely on the fraud on the market presumption of reliance.  The applicability of the fraud on the market presumption would have ultimately turned into a hotly contested battle of the experts, with both sides submitting expert reports supporting their view of the facts.

35.    Lead Plaintiff also faced particularly serious risks with respect to establishing **loss causation and damages**. Although Lead Plaintiff believed the evidence would establish that Defendants' allegedly false denial of appraisal rights prevented class members from obtaining fair value for their shares, proving that the value of Changyou ADSs was higher than the prices class members received when they sold the ADSs, or that class members held ADSs to their detriment,

---

[5] Subsequent to the Settlement, Changyou's appeal of the initial opinion resulted in a partial affirmation, *In the matter of Changyou.com Limited* CICA (Civil) Appeal 6 of 2022 (Sep. 16, 2022), however Changyou has further appealed to the Privy Council.

would have been very difficult and complex, and would have been hotly contested by the Parties' respective experts.

36. Although Lead Plaintiff was confident expert opinion and testimony would have supported its claims that the Company's fair value exceeded the prices members of the class sold their shares for during the Class Period, in connection with a summary judgment challenge and at trial, defendants would have put forth their own experts who would strenuously argue to the contrary. Ultimately, the fair value of the ADSs would have been the subject of a complex and widely divergent "battle of the experts" and up to a jury to decide with no certainty that Lead Plaintiff's experts would be credited over defendants.

37. In addition to these specific merits issues, Lead Plaintiff also faced a long road to reaching a judgment. Lead Plaintiff would need to conduct discovery on a foreign company and foreign-based individuals to develop the facts necessary to prove the claims in the case. Class certification would have been hotly contested and posed numerous risks in light of the merits issues above and somewhat unusual posture of this as a "defrauded sellers" case. Expert testimony would have been crucial to establishing issues such as reliance and damages, and would certainly have been the subject of expert discovery and *Daubert* motions. Defendants would likely have moved for summary judgment, challenging each of the merits issues detailed above. Trial would have been complex and would have required presentation of issues of both corporate law and foreign law to a jury. Finally, Defendants could have tied up any successful trial outcome with appeals.

38. Even if all the above obstacles were overcome, there were significant risks to Lead Plaintiff's ability to enforce a judgment against foreign-based individuals and foreign entities.

## VI.    LEAD PLAINTIFF'S PROVISION OF NOTICE AND THE REACTION OF THE SETTLEMENT CLASS TO DATE

39.    On July 5, 2022, the Court granted Lead Plaintiff's unopposed motion for preliminary approval of the Settlement (the "Preliminary Approval Order").  ECF No. 58. Pursuant to the Preliminary Approval Order, the Court: (i) preliminarily approved the Settlement; (ii) approved the forms and manner of notice to the Settlement Class; and (iii) preliminarily certified, for Settlement purposes only, the Settlement Class and appointed Lead Plaintiff as Class Representative and Labaton Sucharow LLP as Class Counsel for the Settlement Class. *Id*.

40.    Pursuant to the Preliminary Approval Order, the Court appointed Strategic Claims Services ("SCS") as the Claims Administrator and instructed SCS to disseminate copies of the Postcard Notice, long-form Notice and Claim Form and to publish the Summary Notice.  Lead Counsel selected SCS based on its reasonable fee proposal and familiarity with "seller" cases.

41.    The Postcard Notice and long-form Notice, attached as Exhibits A and B to the Declaration of Margery Craig Concerning (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Mailing of CAFA Notice; and (D) Report on Requests for Exclusion Received to Date, dated December 21, 2022 (the "Mailing Declaration", Ex. 3), provide potential Settlement Class Members with information about the terms of the Settlement and, among other things: their right to opt-out of the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form to be eligible for a payment from the net proceeds of the Settlement.  The Postcard Notice and long-form Notice also informed Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees of no more than 30% of the Settlement Fund and for payment of expenses in an amount not to exceed $60,000.

16

42.     As detailed in the Mailing Declaration, on July 20, 2022, SCS began mailing the Postcard Notice to potential Settlement Class Members, as well as banks, brokerage firms, and other third party nominees whose clients may be Settlement Class Members.  Ex. 3 at ¶¶2-10.  In total, to date, SCS has provided Postcard Notices to 6,934 potential Settlement Class Members and nominees.  *Id.* at ¶9.

43.     On August 1, 2022, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over *Globe Newswire* for dissemination across the internet. *Id*. at ¶11 and Exhibit C attached thereto.

44.     SCS also maintains and posts information regarding the Settlement on its website, www.StrategicClaims.net/changyou/, to provide Settlement Class Members with information, including downloadable copies of the long-form Notice, Claim Form, and the Stipulation, and an online claim portal.  *Id*. at ¶13.  The web page for Changyou has been viewed by 1,048 unique users more than 3,223 times.  *Id*.

45.     The notices informed Settlement Class Members that in order to qualify for a payment from the Net Settlement Fund, a Claim Form must be timely filed either online at www.StrategicClaims.net/changyou/ or by mail, with a postmark of no later than January 23, 2023. The majority of claims are filed close to or on the deadline.  SCS will provide information regarding the claims submitted in its supplemental mailing declaration, which will be filed with the Court on January 20, 2023, after the objection and exclusion deadlines have passed.

46.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application is January 6, 2023, and the deadline to request exclusion from the

17

Settlement Class is January 6, 2023.  To date, no objections to the Settlement have been received and the Claims Administrator has not received any requests for exclusion.  *Id*. at ¶¶15-16.

47.    Lead Counsel will respond to any future objections and exclusion requests and report additional claim information in its reply papers.

## VII.    PLAN OF ALLOCATION

48.    Pursuant to the Preliminary Approval Order, and as set forth in the notices, all Settlement Class Members who wish to participate in a distribution of the Settlement proceeds must submit a valid Claim Form, including all required information, no later than January 23, 2023.  As provided in the notices, after the deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, Taxes, and any other fees or expenses approved by the Court, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to eligible claimants by the Claims Administrator according to the plan of allocation approved by the Court (the "Plan of Allocation" or "Plan").

49.    The proposed Plan of Allocation, which was set forth in full in the long-form Notice (Ex. 3-B at ¶¶54-66), is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  The Plan was prepared by Lead Counsel with the assistance of Lead Plaintiff's experts and is consistent with Lead Plaintiff's theories of damages in the case.  All Settlement Class Members that were allegedly harmed as a result of the alleged fraud, and that have an eligible claim, will receive their *pro rata* share of the Net Settlement Fund.  Ex. 3-B at ¶¶56, 61.  Lead Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

50.    The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Loss Amounts," calculated

according to the Plan's formulas.  Recognized Loss Amounts are derived from the number of shares held and sold during the Class Period.

51.     As previously explained to the Court, in the Declaration of Jake Bissell- Linsk (*see* ECF No. 56), the proposed Plan of Allocation attributes losses based on three categories of transactions.  Type A recognizes losses based on ADS that were sold or tendered on April 23, 2020.  Type B recognizes losses based on ADS that were held at the start of the Class Period and sold during the Class Period.  Type C recognizes losses for all other ADS that were sold during the Class Period.  Eligible shares sold within these three periods will have Recognized Loss Amounts equal to the difference between Lead Plaintiff's estimate of the nominal "fair value" of Changyou stock of $38.26 and the price at which the shares were sold.  The nominal fair value was set based on an estimate of Changyou's fair value but it is not a factual determination of the actual fair value of Changyou ADS, which would have been hotly contested at trial.

52.     The *pro rata* recovery any given eligible claimant will receive will be determined based on that claimant's Recognized Claim as a portion of the total Recognized Claims of all eligible claimants.  Because the same nominal fair value is used in each loss category, and the Settlement will be divided *pro rata* (with the exception of the cap applied to Type C), increasing or decreasing the nominal fair value within a reasonable range, would not result in materially greater or smaller recovery amounts for each claimant.  In other words, increasing the nominal fair value increases each claimants' Recognized Claim, but also increases the total Recognized Claims for all claimants.

53.     The Plan of Allocation calculates Recognized Loss Amounts in Type A (losses from ADS that were tendered or sold on April 23, 2020) and Type B (losses from ADS that were held before the Class Period and sold during the Class Period) similarly.  Each is assigned a

Recognized Loss Amount equal to the estimated nominal fair value per ADS of $38.26 minus the ADS sale price. In the case of Type A, the sale price is the $10.80 deal price. In the case of Type B, the sale price is the actual sale price. This treatment has been proposed because of the assessment that these two types of transactions faced risks that were similar in significance.

54.     With respect to Type C (*i.e.*, ADS purchased during the Class Period and sold during the Class Period), although the loss calculation is similar to that of Type B, the Plan of Allocation puts a cap on the total allocation available to this third type of Recognized Loss Amount of no more than 5% of the Net Settlement Fund. This treatment has been proposed because of the assessment that this category of ADS faced the greatest risks to succeeding through litigation.

55.     The sum of a claimant's Recognized Loss Amounts will be the claimant's "Recognized Claim." If the aggregate amount of all Recognized Claims of all Authorized Claimants is greater than the Net Settlement Fund, which is likely given that the Settlement does not recover 100% of alleged damages, each Authorized Claimant will receive a payment equal to their *pro rata* share of the Net Settlement Fund, assuming that their payment would be $10.00 or greater.[6]

56.     The Court-approved Claims Administrator, SCS, under Lead Counsel's direction, will calculate claimants' Recognized Loss Amounts using the transactional information provided in their Claim Forms. Claims may be submitted to the Claims Administrator through the mail, online using the case webpage or, for large investors with thousands of transactions, through email to SCS's electronic filing team. (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.) Lead Plaintiff's losses will be calculated in the same manner.

---

[6] $10.00 is a standard "*de minimis*" figure for payments given the costs associated with issuing payments and to lessen the number of uncashed checks.

57.    After the Effective Date of the Settlement, in accordance with the terms of the Stipulation, the Plan of Allocation, any such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund will be distributed to Authorized Claimants. After the distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of the distribution, the Claims Administrator will, if feasible and economical after payment of any outstanding Notice and Administration Expenses and Taxes, re-distribute the balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion.  There may be multiple re-distributions.  Once it is no longer economical to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of any outstanding Notice and Administration Expenses, and Taxes, if any, shall be contributed to Consumer Federation of America, a  not-for-profit, charitable organization serving the public interest, or such other non-sectarian, not-for-profit charitable organization approved by the Court.

58.    To date, there have been no objections to the proposed Plan of Allocation.

59.    In sum, the proposed Plan of Allocation was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## VIII.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

60.    For its efforts on behalf of Lead Plaintiff and the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As explained in Lead Counsel's Fee Brief, courts within the Second Circuit recognize that the percentage method

21

is the appropriate method of fee recovery and the prevailing method of determining attorneys' fees in the Second Circuit.

61.    Consistent with the Notice, Lead Counsel seeks a fee award of 30% of the Settlement Fund, *i.e.,* $322,500, plus accrued interest, if any.  Lead Counsel also requests payment of its expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $41,785.97, plus Lead Plaintiff's request for $15,000, pursuant to the PSLRA. Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

**A.    Lead Plaintiff Supports the Fee and Expense Application**

62.    Lead Plaintiff is a sophisticated institutional investor that played a central role in monitoring and participating in the Action by, among other things, (i) regularly communicating with Lead Counsel regarding the strategy and progress of the Action; (ii) reviewing and/or discussing significant pleadings, motions, and briefs filed in the Action; (iii) monitoring and participating in settlement discussions; and (iv) evaluating and approving the proposed Settlement. *See* Ex. 1.

63.    Lead Plaintiff evaluated and fully supports the Fee and Expense Application. *See* Ex. 1.  In coming to this conclusion, Lead Plaintiff considered the efficient prosecution of the action, the work performed, and the recovery obtained for the Settlement Class.  Lead Plaintiff agreed to allow Lead Counsel to apply for 30% of the Settlement Fund. *Id.* at ¶6.

**B.    The Favorable Settlement Achieved**

64.    Here, as described above, the $1,075,000 Settlement is a certain and favorable result, when considered in view of the substantial risks and obstacles to recovery with respect to the motion to dismiss and if the Action were to continue through decisions on class certification and summary judgment, to trial, and through likely post-trial motions and appeals.

22

65.    As set forth in above, the recovery obtained for the Settlement Class was the result of diligent investigative and prosecutorial efforts.  As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or significantly less recovery) in the absence of a settlement.

**C.    The Risks and Unique Complexities of Contingent Class Action Litigation**

66.    This Action presented substantial challenges from the outset of the case.  The specific complexities and risks Lead Plaintiff faced in proving Defendants' liability and damages are detailed in Section V. above.  These case-specific risks, which were made evident to Lead Counsel and Lead Plaintiff as they investigated, are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis.  Here, there was no restatement, no Company admissions, and no parallel governmental or criminal proceedings, which would have aided Lead Plaintiff or Lead Counsel in proving elements of the case, like falsity, materiality and scienter.

67.    From the outset, Lead Counsel understood that it was embarking on a complex and expensive litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and cover the considerable costs that a case such as this requires.  With no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

68.    Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard

23

work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint, win at trial, or convince sophisticated defendants to engage in serious settlement negotiations. Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case was commenced—like that existed in the Action—or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of Plaintiff's bar produced no fee for counsel.

69.    Federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgment and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

70.    Even successfully certifying a class and successfully opposing a motion for summary judgment would not guarantee that Lead Plaintiff would prevail at trial. Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Lead Counsel, or partially lost, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

71.    Even plaintiffs who succeed at trial may find their verdict overturned. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, No. 07-cv-61542 (S.D. Fla. 2010) (in case tried by Lead Counsel,

24

after Plaintiff's jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd*, 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law for lack of loss causation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing Plaintiff's jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning Plaintiff's verdict obtained after two decades of litigation).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court tossing unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity & Benefit Fund*, 131 S. Ct. 1602 (2011)).

72.    Losses such as those described above are exceedingly expensive for Plaintiff's counsel to bear.  The fees that are awarded in successful cases are used to cover enormous overhead expenses incurred during the course of litigations and are taxed by federal, state, and local authorities.

73.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and

directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can only occur if private plaintiffs can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that will adequately compensate private Plaintiff's counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

74. As discussed in detail above, this case was fraught with significant risk factors concerning liability and damages. Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff and Lead Counsel potentially faced years of costly and risky appellate litigation against Settling Defendants, with ultimate success far from certain and the prospect of no recovery significant. Lead Counsel therefore respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### D.    The Time and Labor of Lead Counsel

75. The work undertaken by Lead Counsel in investigating and prosecuting this case, and arriving at the present Settlement in the face of serious hurdles, has been challenging. As explained above, counsel conducted a thorough investigation into the class's claims and researched and prepared a comprehensive amended complaint.

76. Attached as Exhibit 4 is the Declaration of Carol C. Villegas on Behalf of Labaton Sucharow LLP detailing Lead Counsel's time and expenses. Included with this declaration is a schedule that reports the amount of time spent by the attorneys and professional staff of Labaton Sucharow and the "lodestar" calculations, *i.e.,* their hours multiplied by their 2022 hourly rates. *See* Ex. 4-A. As explained in the declaration, it was prepared from records regularly prepared and maintained by Lead Counsel. *Id.* ¶3.

77.    At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial, by the most efficient means possible. Lead Counsel carefully and efficiently staffed the Action from the beginning. Several partners were involved, but at particular stages of the case, such as the preliminary investigation, lead plaintiff appointment, litigation, or settlement, consistent with their areas of expertise.

78.    The hourly rates of Lead Counsel here range from $875 to $1,150 for partners, $600 to $850 for of counsels, $450 to $475 for associates, and $375 to $390 for paralegals. *See* Ex. 4-A. It is respectfully submitted that the hourly rates for Lead Counsel included in this schedule are reasonable and customary for this type of complex commercial litigation. A table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2021 is attached as Exhibit 5. The analysis shows that across all types of attorneys, Lead Counsel's rates are consistent with, or lower than, the firms surveyed.

79.    Lead Counsel has expended 631 hours in the prosecution and settlement of the Action through December 15, 2022. *See* Ex. 4-A. The resulting lodestar is $426,427.00, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting Settlement Class Members. *Id*. Pursuant to a lodestar "cross-check," applied within the Second Circuit, the requested fee of 30% of the Settlement Fund (or $322,500) results in a negative "multiplier" of 0.76 on the lodestar – meaning that Lead Counsel is seeking less than its lodestar in fees.

**E.    The Skill Required and Quality of the Work**

80.    Lead Counsel Labaton Sucharow is among the most experienced and skilled securities litigation law firms in the field. The expertise and experience of its attorneys are described in Exhibit 4-C.

81.    Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States, and has taken three of the approximately 21 post-PSLRA securities class actions to trial.  Here, Labaton Sucharow attorneys have devoted time and effort to this case, thereby bringing to bear many years of collective experience.  For example, Labaton Sucharow has served as lead counsel in a number of high profile matters:  *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 4-C.

**F.    Standing and Caliber of Defendants' Counsel**

82.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Goulston & Storrs PC and Skadden, Arps, Slate, Meagher & Flom LLP, prestigious and experienced defense firms, which vigorously represent their clients.  In the face of this

28

experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

## IX.    LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES

83.    Lead Counsel seeks payment from the Settlement Fund of $41,785.97 in litigation expenses reasonably and necessarily incurred in connection with prosecuting the claims against Defendants.  *See* Ex. 4-B.  The notices informed the Settlement Class that Lead Counsel would be applying for payment of expenses of no more than $60,000, which may include Lead Plaintiff's request for expenses directly related to its representation of the Settlement Class, pursuant to the PSLRA.  *See* Ex. 3-A & B at ¶¶4, 41.  The amount requested is below this cap.  To date, no objection to Lead Counsel's request for expenses has been raised.

84.    As attested to, Lead Counsel's expenses are reflected on the books and records maintained by Labaton Sucharow.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  Lead Counsel's declaration identifies the specific category of expense – *e.g.*, expert fees, investigator fees, translation fees, electronic legal and factual research, service of process and court fees.

85.    All of the litigation expenses incurred, which total $41,785.97, were necessary to the successful prosecution and resolution of the claims against Defendants.

86.    In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.  Accordingly, it is respectfully submitted that the expenses incurred by Lead Counsel should be paid in full from the Settlement Fund.

## X.    LEAD PLAINTIFF'S REIMBURSEMENT PURSUANT TO THE PSLRA

87.    Additionally, in accordance with 15 U.S.C. § 78u-4(a)(4), Lead Plaintiff ODS Capital LLC seeks reimbursement for the time it dedicated to the representation of the Settlement Class in the amount of $15,000, which, when included with Lead Counsel's expenses, is below the $60,000 that the notices informed the Settlement Class would be the cap on expenses.  The effort devoted to this Action by Lead Plaintiff is detailed in the accompanying Declaration of Hilary Shane, Managing Member of ODS Capital LLC, attached as Exhibit 1.  Lead Counsel respectfully submits that the amount requested by Lead Plaintiff is consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

88.    As discussed in the Fee Brief and in Lead Plaintiff's supporting declaration, Lead Plaintiff has been committed to pursuing the class's claims since it became involved in the litigation.  Lead Plaintiff actively and effectively fulfilled its obligations as the representative of the class, complying with all of the demands placed upon it during the litigation and settlement of the Action.  For instance, Ms. Shane (a) provided valuable contributions to the development of the core case theory given her advanced degree in finance and experience with issues concerning mergers and appraisal rights; (b) had regular in-person, telephonic, and written communications with Lead Counsel concerning the Action; (c) remained fully informed regarding case developments; (d) reviewed pleadings and motions filed in the Action; and (e) closely monitored and participated in settlement discussions, ultimately agreeing to accept the Settlement, subject to the Court's approval.  Ex. 1 at ¶4.

89.    This was time that Ms. Shane did not spend conducting the usual business of the Lead Plaintiff, which represents a cost to ODS.  The efforts expended by Lead Plaintiff during the

course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support Lead Plaintiff's request.

## XI. THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

90. As mentioned above, consistent with the Preliminary Approval Order, to date SCS has provided Postcard Notices to 6,934 potential Settlement Class Members and nominees advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not greater than $60,000, which includes Lead Plaintiff's reimbursement of expenses directly related to its representation of the Settlement Class. *See* Ex. 3-A. Additionally, the long-form Notice has also been available on the case webpage maintained by the Claims Administrator (*id.* at ¶13) and on Labaton Sucharow's website.[7]

91. While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no one has objected. Lead Counsel will respond to any objections that may be received in its reply papers.

## XII. MISCELLANEOUS EXHIBITS

92. Attached as Exhibit 6 is a compendium of unreported cases, in alphabetical order, cited in the accompanying memoranda of law.

## XIII. CONCLUSION

93. In view of the favorable and certain recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved

---

[7] Lead Plaintiff' motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement webpage and Labaton Sucharow's website.

as fair, reasonable, and adequate, and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the recovery in the face of substantial risks; the quality, efficiency, and work performed; the contingent nature of the fee; and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submits that a fee in the amount of 30% of the Settlement Fund be awarded, that its expenses in the amount of $41,785.97 be paid, and that Lead Plaintiff be reimbursed $15,000, pursuant to the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 22, 2022.

_____
CAROL C. VILLEGAS